## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CLARE BRONFMAN,

      Petitioner-Plaintiff,

v.

TIMETHEA PULLEN, in her official capacity as Warden of FCI Danbury; FEDERAL BUREAU OF PRISONS; BRYAN ANTONELLI, in his official capacity as Acting Regional Director of the Federal Bureau of Prisons' Northeast Region; COLETTE PETERS, in her official capacity as Director of the Federal Bureau of Prisons,

      Respondents-Defendants.

Case No. 23-cv-619

## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

Petitioner-Plaintiff Clare Bronfman ("Petitioner" or "Ms. Bronfman"), by and through her attorneys, The Law Office of Michael L. Chambers Jr., Ronald Sullivan Law PLLC, and Levin & Associates PLLC, as and for her Petition against Respondents-Defendants Timethea Pullen, in her official capacity as Warden of FCI Danbury; the Federal Bureau of Prisons; Bryan Antonelli, in his official capacity as Acting Regional Director of the Federal Bureau of Prisons' Northeast Region; and Colette Peters, in her official capacity as Director of the Federal Bureau of Prisons (collectively, "Respondents"), alleges as follows:

## SUMMARY OF ACTION

1.    The facts underlying this petition have largely already been pled, briefed, and argued in this Court in Case No. 3:22-cv-838 (JAM).

2.    Since approximately December 28, 2020, Ms. Bronfman has been subjected to unlawful conditions of confinement within the Federal Bureau of Prisons (the "BOP") following

her September 30, 2020 sentencing before United States District Judge Nicholas G. Garaufis of the United States District Court for the Eastern District of New York. *See* Order, *United States v. Bronfman*, Case No. 18-cr-204 (NGG) (E.D.N.Y. Sep. 30, 2020), ECF No. 937.

3.     Initially, Ms. Bronfman was subjected to these conditions as a result of an arbitrary and capricious decision by the BOP to apply a "sex offender" Public Safety Factor ("PSF") against her. In applying this PSF, the BOP not only abused its discretion and violated its own internal guidelines and policies, it also relied on demonstrably false factual claims to justify the PSF designation.

4.     Indeed, there was no credible evidence to support the BOP's determination that Ms. Bronfman is a sex offender or is in any way eligible for the sex offender PSF, a fact clearly recognized by Judge Garaufis when he sentenced her. Rather, in determining that the sex offender PSF is appropriate as to Ms. Bronfman, the BOP either fundamentally misunderstood or mischaracterized her Presentence Investigation Report ("PSR"), or relied on demonstrable and provable factual errors to support its determination. The resulting application of the PSF as to Ms. Bronfman was therefore arbitrary and capricious and constituted an abuse of the BOP's discretion.

5.     Ms. Bronfman filed a petition for a writ of habeas corpus with this Court. Both parties submitted briefings and participated in oral argument. Before that court had time to issue its order, however, BOP seemed to recognize how wrong they had been: they agreed to a joint stipulation agreeing to remove the false and defamatory sex offender label from Ms. Bronfman's file and accordingly the petition was dismissed without prejudice.

6.     Though BOP has removed the PSF from her file, BOP nonetheless unconstitutionally burdens Ms. Bronfman by arbitrarily and capriciously replacing the "sex offender" label with a "management variable" label in clear retaliation for her having exercised

her rights to bring a Habeas action against the BOP. Indeed, since BOP and Ms. Bronfman entered into the joint stipulation, BOP's treatment of Ms. Bronfman has *worsened* in retaliation for her attempts to vindicate her rights.

7.      Rather than treating Ms. Bronfman like similarly situated inmates who do not have a "sex offender" PSF, the BOP, in apparent retaliation for Ms. Bronfman filing the underlying petition, applied a "Greater Security" Management Variable to Ms. Bronfman without cause or justification.

8.      No Management Variable was in Ms. Bronfman's file prior to her filing the original Habeas Corpus petition. Only after the government entered into the settlement did BOP apply the Management Variable with no cause or justification.

9.      The BOP further fraudulently induced Ms. Bronfman into withdrawing from the Female Integrated Treatment ("FIT") program, as BOP misrepresented to Ms. Bronfman that she had a "program hold" on her file that prevented her from being transferred to a minimum security prison camp, a designation Ms. Bronfman should have been eligible for since the day of her incarceration. The BOP's unlawful "sex offender" PSF barred that assignment.

10.     Ms. Bronfman expressed in writing to the BOP that, after her appeals had finalized, she was eager to do the FIT program, but she understood that in order to be moved from FCI-Danbury, a low security facility, to an adjacent minimum security camp (the "Danbury Camp"), she had to get the program hold removed by withdrawing from the FIT program.

11.     This proved to be a classic bait and switch.  BOP fraudulently lured Ms. Bronfman into withdrawing from the FIT program, but rather than designating her to a prison camp, BOP slapped a Management Variable on Ms. Bronfman to justify moving her to the Federal Detention Center, Philadelphia ("FDC-Philadelphia") in an attempt to avoid the jurisdiction of this court and

retaliate against Ms. Bronfman for exercising her constitutional rights to petition the court for a Writ of Habeas Corpus.

12.    On information and belief, the BOP, without cause or justification, suddenly applied a Management Variable to Ms. Bronfman because her custody level was designated as low – minimum "out." The only way for an inmate to move from FCI Danbury to FDC Philadelphia with such a love custody level is for that person to have a management variable. As such, BOP quickly slapped a management variable on Ms. Bronfman, but forgot

13.    Additional evidence of retaliation exists. Indeed, only days after agreeing to the joint stipulation, the BOP abruptly and without explanation terminated Ms. Bronfman's longstanding weekly calls with her counsel, and, equally abruptly, announced that Ms. Bronfman would now be prohibited from having any mail, telephone, or email contact with more than two dozen family members, friends, and associates.

14.    More significantly, as noted above, the BOP made false promises to Ms. Bronfman regarding her transfer to Danbury Camp. Once Ms. Bronfman withdrew her application from the FIT program, she was informed one week later by her case manager that she was designated for transfer to the Danbury Camp.

15.    This was a baldfaced lie. Several days prior to Ms. Bronfman being told she was being transferred to Danbury Camp, the FCI-Danbury Warden requested that Ms. Bronfman be transferred back to FDC-Philadelphia in a transparent attempt to evade the jurisdiction of this Court. Instead of following through on their promise to place her in Danbury Camp, the BOP waited for the transfer request to be approved before moving her back to FDC-Philadelphia three months later.

16.     Not only did the BOP lie to Ms. Bronfman regarding her transfer to the Danbury Camp, but, upon information and belief, they also violated the spirit of the joint stipulation by placing an unjustified new black mark on her file: a Management Variable of "Greater Security."

17.     According to the BOP's own policies, this Management Variable should be applied only in certain limited circumstances such as pending charges, detainer, or escape risk—none of which apply to Ms. Bronfman.

18.     Rather than document any such circumstances, the BOP instead attempts to justify the Management Variable by claiming that she belongs to a Security Threat Group ("STG")—a label typically employed against prison gangs.

19.      Upon information and belief, this Management Variable was used as a pretext by the BOP to transfer Ms. Bronfman to FDC-Philadelphia and is also currently preventing Ms. Bronfman from being placed in a minimum security facility like Danbury Camp.

20.     Absent this Court granting a writ or other appropriate order directing the BOP to cease their retaliatory campaign against Ms. Bronfman, she will remain detained in custody under conditions of confinement that are clearly unlawful and unwarranted given the circumstances of her offense of conviction.

21.     In light of these facts, Ms. Bronfman respectfully requests that the Court issue a Writ, pursuant to 28 U.S.C. §§ 2241(a) and (c)(1), 2242, and 2243, directing the BOP to cease retaliating against her, specifically by: (1) removing the "management variable" they have placed on her file; (2) and returning her to FCI Danbury, a return to the status quo ante.

22.     In light of this unrelenting campaign of lies and retaliation, Ms. Bronfman also respectfully requests that the Court: (1) order BOP Director Colette Peters to testify before this Court regarding the circumstances of the application of the management variable to her file and of

her transfer to FDC-Philadelphia; (2) hold Respondents in contempt for violating the joint stipulation by placing a management variable on her file; and (3) hold that Respondents acted arbitrarily and capriciously by placing a management variable on her file.

## JURISDICTION AND VENUE

23.     Ms. Bronfman brings this action under 28 U.S.C. §§ 2241(a), (c)(1), 2242, and 2243. Ms. Bronfman further invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202. This Court has authority under 28 U.S.C. § 2241 to grant the writ of habeas corpus.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 2241 because Ms. Bronfman filed her original habeas petition with this Court when she was confined in this District. *See Young* v. *Aviles*, 99 F. Supp. 3d 443, 446 n.2 (S.D.N.Y. 2015) ("There is no dispute that jurisdiction and venue are proper, as [petitioner] was present in this District at the time that the petition was actually filed"); *Cruzeta -Bueno* v. *Aviles*, 15 Civ. 1640 (PAE), 2015 WL 2117848, at *1 n.1 (S.D.N.Y. May 5, 2015) (finding habeas jurisdiction in New York proper when petitioner was detained in another district because the original petition was filed in New York); "); *Mendoza* v. *Muller*, No. 11 Civ. 7857 (RJS), 2012 WL 252188, at *3 (S.D.N.Y. Jan. 25, 2012) ("Although Petitioner is being held in New Jersey, jurisdiction is proper in this Court because he filed the petition while detained in New York").

25.     Jurisdiction and venue are particularly proper in this District in this case because Respondents have attempted to evade the jurisdiction of this Court by transferring Ms. Bronfman to Philadelphia.

## PARTIES

26.     Petitioner Clare Bronfman is currently incarcerated in the Philadelphia – Federal Detention Center ("Philadelphia-FDC"), but was previously incarcerated in Federal Correctional Institution, Danbury ("FCI-Danbury") until March 29, 2023.

27.     The Warden of FCI-Danbury is sued in their official capacity.

28.     Respondent Bryan Antonelli is the Acting Regional Director of the BOP's Northeast Region. He is sued in his official capacity.

29.     Respondent Colette Peters is the Director of the BOP. She is sued in her official capacity.

30.     Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, and other government agents or employees.

## BACKGROUND

**A.     Ms. Bronfman Was Convicted of Non-Sex Trafficking Offenses, but the PSR Drafted by the United States Probation Office Nonetheless Includes Irrelevant Descriptions of Sex Offenses Alleged Against Her Co-Defendants.**

31.     Ms. Bronfman was arrested by federal agents on July 24, 2018, and subsequently charged in a multi-count indictment. On April 19, 2019, Ms. Bronfman pled guilty to two charges: Conspiracy to Conceal and Harbor Aliens for Financial Gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i), and Fraudulent Use of a Means of Identification, in violation of 18 U.S.C. § 1028(a)(7).

32.     As set forth in Judge Garaufis' Sentencing Memorandum, the conviction for the immigration offense at issue stems from Ms. Bronfman's role in securing a visa for a Mexican

national ("Jane Doe")[1] who was employed by a company affiliated with a company called NXIVM, an executive coaching and self-help organization founded by Ms. Bronfman's co-defendant, Keith Raniere. A true and correct copy of Judge Garaufis' Sentencing Memorandum is attached hereto as Exhibit A. (To avoid header-overlap, the original header has been removed; it reads: Case 1:18-cr-00204-NGG-VMS Document 936 Filed 09/30/20.)

33.     Following her conviction, the United States Probation Office conducted a presentence investigation and drafted a PSR for, *inter alia*, the court's consideration in determining Ms. Bronfman's sentence.

34.     Ms. Bronfman's PSR outlines the conduct underlying her offenses of conviction. A true and correct copy of Ms. Bronfman's PSR is attached hereto under seal as Exhibit B.

35.     Unfortunately, Ms. Bronfman's PSR also delves into irrelevant, excruciating, and unnecessary detail concerning the alleged actions and activities of her co-defendants, including details and descriptions of Dominus Obsequious Sororium ("DOS"), a secret organization comprised of certain individuals, some of whom, but not all, had taken NXIVM courses. Ms. Bronfman objected to the fact that her PSR regurgitated details and descriptions related to the alleged sex trafficking offenses of Mr. Raniere and other co-defendants, but Judge Garaufis declined to rule on those objections. A true and correct copy of Ms. Bronfman's Objections to the PSR is attached hereto under seal as Exhibit C.

36.     Although Ms. Bronfman's *co-defendants* were convicted of several crimes, including "sex trafficking conspiracy[] and two counts of sex trafficking," ___**no such conspiracy charges or substantive sex trafficking allegations were ever leveled against Ms. Bronfman**___ and

---

[1] In relevant court documents, this individual is referred to as "Jane Doe 12."

the description of those activities by others described in the PSR were not relevant conduct to her own offense of conviction. Ex. A at 6-7.

37.     Not only did Ms. Bronfman not participate in any of the DOS or alleged sex trafficking-related activities described in the PSR, but she was also not even aware of any such alleged activity. Indeed, members of DOS, including three of Ms. Bronfman's co-defendants, kept DOS a secret from Ms. Bronfman, as is the nature of any secret society, and she had no idea that the group existed until it was revealed publicly in 2017. *See, e.g.*, Ex. A at 6 n.2 ("Paragraph 14 [of the PSR Addendum discussing DOS] does not state that Ms. Bronfman *was aware of or involved with DOS, or that she directly funded it*.") (emphasis added).

38.     There was zero evidence at Mr. Raniere's trial from any DOS witness that Ms. Bronfman was told about DOS.  Indeed, as set forth below and herein, evidence at trial showed that DOS was kept secret from the NXIVM community from the time of its formation until May 2017.

39.     Any and every of Ms. Bronfman's codefendants who testified about DOS affirmed that she did not participate in and had no knowledge of DOS until the world learned about it via a media exposé. The government's "star" witness in the Raniere trial made it clear that DOS's existence was kept secret, including from Ms. Bronfman.  Lauren Salzman testified during the trial that all DOS meetings were secret, and that the group, including Keith Raniere's involvement in the group, was a secret.  (*See* Salzman Testimony at 1509-10: secret DOS meetings were initially "held at people's homes" before they were held at "the sorority house" that the group purchased; it was "concealed that Keith was—was the founder of the group, was a member of the group, and participated in any way in the group").  She further testified, as did other DOS members, that no one was provided with any information about the group until they were invited to learn about it

and provided collateral – "something valuable enough or damaging enough that would ensure a total commitment to secrecy; that you would rather—that you would keep a secret like until you died than have this information come out" (*See* Salzman Testimony at 1602-03).

40.     In other words, the conduct that formed the core of the criminal case against Mr. Raniere, Ms. Allison Mack, and Ms. Lauren Salzman was concealed from Ms. Bronfman by her supposed co-conspirators.

41.     Furthermore, even after Ms. Bronfman learned of DOS's existence, members of DOS continued to conceal from her many aspects of DOS, including the aspects of it that ultimately led to the criminal prosecution of some of her co-defendants for sex trafficking and other crimes.

42.     The government's star witness, Lauren Salzman, testified at trial that even after the existence of the group became public, they lied to everyone in the community, including her own mother, about Mr. Raniere's involvement. She testified that she "lied to the entire community about it […] lied to the media about it [and] lied to everybody about it" (See Salzman Testimony at 1802-03.)  According to Ms. Salzman, "Keith directed that we [DOS members] were not going to tell anybody about his involvement, [that] it was going to be secret, that he didn't know anything about it, that he wasn't associated with it, that the brand was not his initials and he gave several options for how [DOS members] could address the concerns that were being raised to make it look like they were all things that were not the truth." (*See* Salzman Testimony at 1798-79).

43.     In an August 2017 address to the NXIVM community during "Vanguard Week," Mr. Raniere "said he wasn't affiliated with DOS, that he had very little knowledge about it but he advocated for the group and he said some of the things in the group were a little racy and could be seen as, you know, alternative but that ultimately he thought they were good and essential." (*See*

Salzman Testimony at 1817). "Allison [Mack] and [Salzman] later went to address the NXIVM community [...] and communicated much of what Keith had communicated at V Week, what was in his position statement, what he had discussed with [Salzman] at Punta Mita and answered questions that they [the NXIVM community] had." (*See* Salzman Testimony at 1859.)

44.    Lauren Salzman testified at trial this was kept secret from Ms. Bronfman and was purposefully arranged for a time when Ms. Bronfman was not present, but rather away in Mexico. Tr. 1887: "everybody left, everybody who had been on the trip left except myself, Loreta, Daniella, Nicki and Allison and we stayed to – for this recommitment ceremony. . . Q. Had Clare Bronfman and Marianna, among others, been some of the people who had been present previously? A. Yes. Q. Were they aware of what was to take place? A. No."

45.    Indeed, even the United States recognizes that Ms. Bronfman had no knowledge of DOS or its activities. The government even has conceded that members of DOS did not "disclose[] their membership in DOS to [Ms. Bronfman]" until after the existence of DOS was revealed by the media in 2017. *See* Letter to Hon. Nicholas G. Garaufis from Assistant U.S. Attorney Tanja Hajjar dated September 2, 2020 (ECF No. 927).

46.    As such, Ms. Bronfman was not charged with—much less convicted of—a sex trafficking conspiracy or any other substantive sex trafficking offense.

47.    These facts were recognized by Judge Garaufis in his Sentencing Memorandum where he made clear that Ms. Bronfman was not, and has not ever been, accused of ***any*** sexual offenses. Judge Garaufis went on to state that he wanted to make it "crystal clear [that] Ms. Bronfman was not convicted of" the crimes perpetrated by her co-defendants. Instead, Judge Garaufis stated that he "agree[d] with Ms. Bronfman that the available evidence does not establish that she was aware of DOS prior to June 2017 *or that she directly or knowingly funded DOS or*

*other sex trafficking activities*," Ex. A at 7 (emphasis added), and that he did "not find that Ms. Bronfman knowingly funded a sex cult," *id.* at 16.

48.     After making these findings, Judge Garaufis sentenced Ms. Bronfman to an 81-month prison sentence and recommended that she be detained at the minimum-security camp facility in Danbury, Connecticut. Judgment and Commitment Order, at 2 (Oct. 7, 2020), Case No. 18-cr-204 (NGG), ECF No. # 946, a true and correct copy of which is attached hereto as Exhibit D. (To avoid header overlap, the header indicating the case and ECF numbers has been removed from this exhibit as-filed in this matter.)

**B.      The BOP Unfairly and Arbitrarily Tagged Ms. Bronfman with a Sex Offender PSF Based on the False and Misleading PSR.**

49.     Ms. Bronfman's convictions were limited to the fraudulent use of a means of identification as well as a criminal immigration violation involving her sponsorship of a Mexican citizen in order to facilitate that individual's work for an entity affiliated with NXIVM.  For the BOP to tag her with a sex offender PSF based on the actions of her co-defendants, which Judge Garaufis concluded she knew nothing about and that the government admits the same in its representations, is manifestly unjust.

50.     Broadly, the application of a PSF signals that an inmate has "demonstrated behaviors which require increased security measures to ensure the protection of society."  Federal Bureau of Prisons, Policy No. 5100.08 CN-1, *Inmate Security Designation and Custody Classification* (the "Program Statement") (Sept. 4, 2019) at Ch. 2, p. 4, available at: https://www.bop.gov/policy/progstat/5100_008cn.pdf. PSFs "are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community."

51.     The application of the sex offender PSF precludes an inmate from being designated to any BOP institution with a security classification below "low." *Program Statement* at Ch. 5, p. 8 (emphasis added).

52.     The application of the sex offender PSF also precludes inmates from being assigned to a Community Corrections Center ("CCC"). Federal Bureau of Prisons, Policy No. 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* (Dec. 16, 1998) at p. 10, available at: https://www.bop.gov/policy/progstat/7310_004.pdf. "CCCs provide an excellent transitional environment for inmates nearing the end of their sentences. . . . One reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community. . . .  [E]ligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society." *Id.* at p. 1. Other collateral consequences of the PSF included failing to qualify for early release under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act and/or the First Step Act.

53.     In spite of Judge Garaufis' designation recommendation made during her sentencing hearing and included in his Sentencing Memorandum, the BOP made the erroneous decision, largely based on its arbitrary and capricious application of the sex offender PSF, to initially designate Ms. Bronfman to the Federal Correctional Institution, Tallahassee ("FCI Tallahassee"), a low security facility, located in Tallahassee, Florida.

54.     Regardless of this initial designation, Ms. Bronfman was never actually transferred to FCI Tallahassee. Instead, on or about December 28, 2020, following her sentencing, Ms. Bronfman was designated and transferred to the Federal Detention Center, Philadelphia ("FDC Philadelphia"), located in Philadelphia, Pennsylvania. Both FCI Tallahassee and FDC Philadelphia

have higher security designations than the security classification of the facility that Judge Garaufis specifically recommended for Ms. Bronfman (*i.e.*, minimum security).

55.     In light of her improper designation, on March 2, 2021, Ms. Bronfman filed an Informal Resolution Attempt with the Unit Manager at FDC Philadelphia claiming that she had been wrongly designated to the institution as a result of the improper application of the sex offender PSF.

56.     When the Informal Resolution Attempt was denied on March 17, 2021, Ms. Bronfman promptly filed a BP-9 Administrative Remedy Appeal, which was denied on April 1, 2021.

57.     The BOP denied Ms. Bronfman's BP-9 appeal on the basis—again, according to BOP's incorrect reading of the PSR—that Ms. Bronfman "participated in efforts to recruit and secure immigration status for non-citizens so they could work in one or more NXIVM-affiliated organizations or to become sexual partners for a co-defendant."  Central Office Administrative Remedy Appeal, Appeal No. 1073720-F1, Part B Response (Apr. 1, 2021), a true and correct copy of which is attached hereto as Exhibit E.  Specifically, the BOP found that among the individuals that Ms. Bronfman "assisted in entering or remaining in the United States were . . . Jane Does 2, 3, and 4" with whom Ms. Bronfman's co-defendants allegedly "initiated sexual relationships."  *Id.* This is patently and demonstrably false as it pertains to Ms. Bronfman, and the United States is aware of this fact.  Jane Doe 4 testified at Mr. Raniere's trial, and both she and the government's star witness, Lauren Salzman, provided detailed accounts of how the sisters were brought into the country.  ***Jane Doe 4 did not testify that Ms. Bronfman participated in facilitating her or her sisters' entrance into the country.*** Jane Doe 4's parents had paid for her to take a NXIVM course in Monterrey, Mexico, and encouraged Jane Doe 4 to join the NXIVM community in Albany, New

York. Other family members followed shortly thereafter. Indeed, Ms. Bronfman could not have assisted in bringing the sisters to the United States, as Ms. Bronfman herself joined NXIVM around the time Jane Does 2, 3, and 4 associated with NXIVM. *See*, *e.g*, Jane Doe 4 Testimony at 2312 ("Q And what was your -- what were your parents telling you? A My parents were not telling me to go one way or the other. I think they respected my decisions a lot and, honestly, they were also very much into like ESP and enamored with the curriculum. So they never told me do this or do that. They also didn't tell me you can't do this, you can't do that. So we were just discussing it, you know. "); *Id.* at 2313-14 ("A After that, we were all happy about my decision, including my parents. And so we started planning. And the plan ended up being that the time to go coincided with something called -- well it coincided with Keith Raniere's birthday. So it was his birthday celebration. V week. So the plan was for my parents to go drop me off at, you know, at Albany to stay, staying by – staying through V week, setting me up and then leaving. Q So is this August 2002? A Yes. Q How old were you then? A 16."); *Id.* at 2321-2322 ("Q Now, after that event ended, you stayed in -- you stayed in the Albany area; is that right? A Yes, that was a plan. Q And your parents went home? A Yes. Q So where were you living at that time? A So the arrangement that was made was, I was to stay with -- there was a man called Edgar Boone, and he owned an apartment. Nothing really as close in Albany, so walking distance, but it was sort of close to the ESP center, which was in 455 New Garner Road."). ***No witness at Mr. Raniere's trial – not a single one – testified to the contrary.***

58.     Thereafter, Ms. Bronfman filed a BP-10 Administrative Remedy Appeal that was denied on August 16, 2021.

59.     Like its initial application of the PSF, BOP's reasoning underlying its denial of Ms. Bronfman's BP-9 was not supported by any "official documentation" that "clearly indicates" Ms.

Bronfman engaged in the conduct described by the BOP.  Indeed, Ms. Bronfman was not charged with or accused of any immigration or sex trafficking-related offenses in connection with Jane Does 2, 3, or 4.

60.     The BOP's denial of Ms. Bronfman's BP-10 spelled out in even more detail its reasoning than in its denial of the BP-9 appeal.  Specifically, in denying Ms. Bronfman's BP-10 appeal, the BOP stated that Ms. Bronfman "participated in efforts to recruit and secure immigration status for non-citizens, some of whom were minors, *so they could become sexual partners for a co-defendant*."  Central Office Administrative Remedy Appeal, Appeal No. 1073720-R2, Part B Response (Aug. 16, 2021) (emphasis added), a true and correct copy of which is attached hereto as Exhibit F.

61.     This putative justification by the BOP represented an egregious violation of Ms. Bronfman's Due Process rights. The BOP relied on factual errors that are both demonstrable and provable. They relied on factual allegations that range from physical impossibility to averments flatly contradicted by evidence supplied and advanced by the government itself. Ms. Bronfman could not have "recruited" Jane Does 2, 3, and 4. Ms. Bronfman, indisputably, was a professional horse jumper, working and living between Europe and Florida at the time the three sisters were "recruited" into NXIVM. Ms. Bronfman did not and could not have recruited them into NXIVM. *Ms. Bronfman was not even a member of NXIVM at the time Janes Does 2, 3, and 4 were recruited.* She didn't know them, had no way to have known them, and, significantly, there is no evidence – whatsoever – that Ms. Bronfman participated in recruiting Jane Does 2, 3, and 4, let alone for the purpose of sexual relations with Mr. Raniere.

62.     Again, BOP's strained reasoning was not supported by any "official documentation" that "clearly indicates" Ms. Bronfman engaged in the conduct described by the BOP and is squarely contrary to Judge Garaufis' findings.

63.     Ms. Bronfman appealed the denial of her BP-10 appeal by filing a BP-11 appeal on September 14, 2021. Ms. Bronfman, by and through counsel, even sent a separate letter to BOP General Counsel explaining the foregoing described factual errors in a good faith effort to prevent a manifest injustice. Counsel explained that Ms. Bronfman was primarily living outside the country when Jane Does 2, 3, and 4 were recruited into NXIVM.  See Exhibit G.

64.     The BOP denied Ms. Bronfman's BP-11 appeal on January 18, 2022, stating that the "PSF was adequately applied in accordance with" the Program Statement and that "no new information that had not been considered at the lower levels" had been provided. Central Office Administrative Remedy Appeal, Appeal No. 1073720-A3, Part B Response (Jan. 18, 2022), a true and correct copy of which is attached hereto as Exhibit H.  Ms. Bronfman thereby exhausted her administrative remedies for challenging the PSF.

65.     BOP's claim that "no new information" had been provided was patently false. If nothing else, counsel's letter to the General Counsel, Exhibit G, provided new information in light of BOP providing the more precise basis for its erroneous decision. A review of the trial transcript illuminates how demonstrably flawed BOP's analysis was.

66.     The trial transcript reveals clearly that Ms. Bronfman did not recruit Jane Doe 2 into the country, and she had no knowledge of any alleged sexual relationship with Jane Doe 2 and her co-defendant when Jane Doe 2 was underage. The transcript reveals that Jane Doe 2's living arrangement was kept a secret and not even the most senior NXIVM people knew anything about it.  Where Jane Doe 2 was living was kept a secret in the community and Ms. Salzman testified

that "for the period of time when [she] think[s] she was still living at the Victory Way house, there was a story about how she was actually living with Karen Unterreiner . . . [a]nd a lot of people didn't know where she was." Ms. Salzman did not even know where she was living and when she asked Mr. Raniere about it he did not give her an answer. (Salzman Testimony at 1597).

67.     With respect to Jane Doe 3, the trial transcript clearly reveals that Ms. Bronfman joined NXIVM at about the same time as Jane Doe 3 in 2003. Accordingly, Ms. Bronfman could not and did not "recruit" her. Indeed, Ms. Bronfman and Jane Doe 3 were peers. Jane Doe 3 was 20; Ms. Bronfman was 24. Ms. Bronfman did not know anything about Jane Doe 3's immigration status when she first entered the country. At the time, Ms. Bronfman was a horse jumper, living in Europe and Florida and competing around the world. ***Ms. Bronfman was not "recruiting" someone whom she did not even know to an organization to which she did not yet belong.***

68.     Specifically, Jane Doe 3 came to the United States with her immediate family members in 2003, having nothing to do with Ms. Bronfman. Ms. Bronfman only began taking NXIVM classes herself in 2003, the same year that Jane Doe 3 arrived in the United States to live in Albany and take NXIVM curriculum. It is therefore untrue that Ms. Bronfman made efforts to assist Jane Doe 3 in entering the United States, implying that Ms. Bronfman was instrumental in her initial entry to the United States. Ms. Bronfman was 24 years old in 2003, and Jane Doe 3 was 20, so they were peers in the sense that they were of similar age and had joined NXIVM at around the same time. Ms. Bronfman was unaware that Jane Doe 3 had begun a sexual relationship with Mr. Raniere until many years later; until then, Ms. Bronfman knew only that Jane Doe 3 lived in the same house as Mr. Raniere and Pam Cafritz, and that Jane Doe 3 was extremely close to Ms. Cafritz.

69.     On information and belief, BOP's confusion lay in that Ms. Bronfman did, at some much later point, help with Jane Doe 3's immigration status, but this assistance came in 2016, *more than a decade* after Jane Doe 3 entered the country. By this time, Jane Doe 3 lived with Mr. Raniere, a decision with which Ms. Bronfman was wholly uninvolved. Significantly, Ms. Bronfman had no role, whatsoever, in Jane Doe 3's initial entry into the country. BOP, apparently, conflated Ms. Bronfman's 2016 immigration assistance with one of her co-defendant's 2003 recruitment efforts. As such, Ms. Bronfman did not "recruit" and could not have recruited Jane Doe 3 into the country.

70.     Ms. Bronfman had no involvement in Jane Doe 3's immigration status in the United States, and had no reason to know anything about Jane Doe 3's legal status in the United States until after Ms. Cafritz was diagnosed with metastatic renal cancer in 2014.  After the diagnosis, Jane Doe 3 served as Ms. Cafritz's primary companion and caretaker, accompanying her to medical procedures and appointments, and caring for her as she recovered from chemotherapy sessions and surgeries.  At the time of the diagnosis, Jane Doe 3 was in the United States on a valid B1/B2 visitor's visa that allowed her to make multiple entries into the United States but limited the duration of her stay to no more than 180 consecutive days.  Although Jane Doe 3 was careful to leave the US without staying past the 180 days, U.S. Customs and Border Protection (CBP) officers began to caution Jane Doe 3 to secure a different type of visa as the cumulative amount of time she was spending in the United States appeared inconsistent with the purposes of a B1/B2 visa

71.     Only after Ms. Cafritz's diagnosis did Jane Doe 3 and Ms. Bronfman discuss ways that Jane Doe 3 could legally secure a different visa that would allow her to remain in the U.S. to help take care of Ms. Cafritz.  Ms. Bronfman's involvement escalated, however, on January 5,

2016, when CBP officers canceled Jane Doe 3's visa and denied her entry into the U.S.  It is crystal clear from the objective record that Ms. Bronfman had nothing to do with Jane Doe 3's initial recruitment into the country. When Ms. Bronfman did assist with Jane Doe 3's immigration status, it was over a decade later, and Ms. Bronfman hired lawyers to facilitate Jane Doe 3's companionship with a dying friend. Ms. Bronfman did not, as BOP alleged, facilitate an alleged sexual relation with her co-defendant back in 2003.

72.     The trial transcript and ***all*** available evidence compels the same conclusion as above regarding Jane Doe 4. Ms. Bronfman and Jane Doe 4 joined NXIVM at about the same time; therefore, Ms. Bronfman could not have "recruited" Jane Doe 4. Even more, that BOP cites the recruitment of Jane Does 2, 3, and 4 as a justification for Ms. Bronfman's PSF offends every notion of due process and fair play that this country purports to hold dear. *Jane Doe 4, herself, testified at length at Mr. Raniere's trial, and never once mentioned that Ms. Bronfman knew anything about her or her sisters' (Jane Does 2 & 3) immigration.* No other witnesses in the entire trial testified contrary to this.

### C.     The BOP Acted Arbitrarily and Capriciously in Applying a Sex Offender PSF to Ms. Bronfman.

73.     Pursuant to 18 U.S.C. § 4801, the BOP must organize the "Federal penal and correctional institutions … [to] assure the proper classification and segregation of Federal prisoners *according to the nature of the offenses committed*, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions." (emphasis added).

74.     Further, as with all other federal government agencies, the BOP must abide by its own published policies and regulations. *E.g.*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954); *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118,

130 (2d Cir. 2020) ("Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations.").

75.     The BOP's inmate security classifications are governed by the Program Statement. The Program Statement was last updated on September 4, 2019, in light of the passage of the First Step Act, 18 U.S.C. § 3632. In relevant part, the Program Statement allows for the application of the sex offender PSF only where "official documentation[] *clearly indicates*" (emphasis added) that the inmate engaged in one of a few enumerated actions, including "(1) [e]ngaging in sexual contact with another person without obtaining permission to do so …; (2) [p]ossessing, distributing or mailing child pornography or related paraphernalia; (3) [a]ny sexual contact with a minor …; [or] (4) [a]ny sexual act or contact … that is aggressive or abusive in nature."  A true and correct copy of the relevant portions of the Program Statement is attached hereto as Exhibit I.

76.     Though the BOP appears to have relied on the PSR to apply the sex offender PSF to Ms. Bronfman, a responsible reading of the PSR could not, consistent with the requirements of the Program Statement, have led to the application of the PSF as to Ms. Bronfman.

77.     While it is true that the PSR discusses sexual offenses (to which Ms. Bronfman objected), all references to such offenses are directed at Ms. Bronfman's co-defendants. Ms. Bronfman was never convicted *nor accused of* any such crimes. As described above, Judge Garaufis made it "crystal clear [that] Ms. Bronfman was not convicted of" the same crimes as her co-defendants, crimes that included charges of conspiracy to commit sex trafficking. Ex. A at 7. That Ms. Bronfman was not convicted of engaging in any acts in furtherance of that conspiracy is proof positive that she had nothing to do with the sexual offenses allegedly perpetrated by her co-defendants. *In fact, she knew nothing about them.*

78.     Moreover, although the PSR states that Ms. Bronfman and two co-defendants "participated in efforts to recruit and secure immigration status for non-citizens," the PSR critically goes on to say that such efforts were undertaken so that the non-citizens "could work in one or more NXIVM-affiliated organizations *or* [] become sexual partners for Raniere." Ex. B at 7 (emphasis added). The BOP appeared to have read the above text in the PSR without noticing the critical "or" included in the quoted sentence, and arbitrarily concluded that Ms. Bronfman participated in securing immigration status for non-citizens "so that they could become sexual partners for a co-defendant." Ex. D.  This is absolutely not true.

79.     The BOP's interpretation, which is counter to both the judgment of Judge Garaufis and a rational understanding of the plain language of the PSR, was clearly an error. To be clear, Ms. Bronfman admittedly took steps to secure immigration status for an individual who would work "in one or more NXIVM-affiliated organizations." Ex. B ¶ 21. ***This individual was not Jane Does 2, 3, or 4, as the BOP appears to indicate in its BP-9 and BP-10 Administrative Remedy Appeal responses***.  Further, Ms. Bronfman ***did not*** act to bring people into this country to become sexual partners for Mr. Raniere—including Jane Does 2, 3, and 4—nor was she ever accused of such misconduct.

80.     It is therefore clear that "the determination made by the BOP, from nothing more than the language of the PSR," to apply the PSF to Ms. Bronfman was arbitrary and capricious. *See Stafford v. Pratt*, No. CIV. A 3:01-CV-0035-M, 2001 WL 548898, at *3 (N.D. Tex. May 22, 2001). As in *Stafford*, the BOP misinterpreted Ms. Bronfman's PSR. For the BOP to tag Ms. Bronfman with a sex offender PSF based on the description of the convictions of her co-defendants, which Judge Garaufis concluded she knew nothing about and are far afield from her

own activity, therefore violated 18 U.S.C. § 4801 and the Program Statement and was manifestly unfair, arbitrary, and capricious.

### D. Prior *Habeas* Proceedings.

81.    Premised on the above facts, Ms. Bronfman, by and through counsel, filed a petition with this Court. After oral argument and hearing the Court's position on the petition, BOP reached out to discuss a settlement agreement under which they would remove the PSF if Ms. Bronfman agreed to a joint stipulation dismissing the petition without prejudice (the "Joint Stipulation").

82.    The parties filed the Joint Stipulation on November 16, 2022, which the Court approved on November 21, 2022.

83.    Ms. Bronfman agreed to the Joint Stipulation based on the completely reasonable belief, shared by her counsel, that BOP had realized its error and would cease treating her like a sex offender. Sadly, BOP has not done so, and has, through its actions, repeatedly violated the spirit of the settlement of the original habeas action.

### E. The BOP's Campaign of Retaliation against Ms. Bronfman

84.    BOP has engaged in a systematic campaign of retaliation against Ms. Bronfman. Mere days after the Joint Stipulation was filed, BOP abruptly and without explanation ended Ms. Bronfman's weekly legal calls, which had been occurring consistently for most of her time in BOP custody, almost two years, including during her previous placement in FDC-Philadelphia. In a terse email to counsel, BOP stated, "I wanted to advise you that we will need to discontinue the weekly legal calls. If you want to do legal visits, then that is fine. However, we would not be doing both." This is with full knowledge that lead counsel's principal office is in Washington, D.C. and other counsel are located in Chicago, New York, and Massachusetts. The effect is that counsel is

now forced to travel hundreds of miles to have private conversations with Ms. Bronfman because of BOP's impermissible interference with Ms. Bronfman's Sixth Amendment right to counsel.

85.     On December 4, 2022, just a few weeks after the Court approved the Joint Stipulation, BOP announced to Ms. Bronfman and many of her friends and family members that she would not be allowed to contact them via email, phone, or mail. The list of individuals that Ms. Bronfman can no longer communicate with is as notable for its length as for its complete randomness. It includes 28 individuals, including a family member, a former acupuncturist, and a legal news organization. It also—remarkably—includes one of her lawyers.

86.     The legal news organization on the BOP's list is the LISA Foundation, which publishes a weekly newsletter that is sent to subscribers who are incarcerated in the federal prison system. One illustrative recent issue which Ms. Bronfman was prohibited from receiving discussed efforts in the legislature to change the mandatory minimum sentencing requirement disparity between powder and crack cocaine, press reports of various BOP-related litigation and issues, and recent grants of certiorari from the Supreme Court. There is no colorable argument that preventing Ms. Bronfman from reading this newsletter serves any legitimate penological interest.

87.     There is no sensible relationship whatsoever amongst those individuals included on this list and no sensible explanation to be gleaned from comparing the individuals who are now prohibited from communicating with Ms. Bronfman and the individuals who remain on the approved contacts list. The only sensible explanation for this list is, once again, a clumsy and overreaching attempt by BOP to circumscribe Ms. Bronfman's rights, this time in retaliation for having taken them to Court in this case.

88.     More significantly, the BOP made false promises to Ms. Bronfman regarding her transfer from FCI-Danbury, a low security facility, to the Danbury Camp, an adjacent minimum

security camp. Ms. Bronfman was informed that she would need to withdraw her application to a therapy program (known as the FIT program) in order to get a "program hold" removed from her file so that she could be transferred to Danbury Camp.  Ms. Bronfman did so by email to her psychologist, Dr. Stacy on December 16, 2022.  One week later, on December 23, 2022, Ms. Bronfman's case manager, Mr. Rowland, told her she was designated for transfer to Danbury Camp.

89.     Unfortunately for Ms. Bronfman, this statement was a flat-out lie. Several days prior to Ms. Bronfman being told she was being transferred to Danbury Camp, the FCI-Danbury Warden requested that Ms. Bronfman be transferred back to FDC-Philadelphia. Instead of following through on their promise to place her in Danbury Camp, the BOP waited for the transfer request to be approved before moving her back to FDC-Philadelphia three months later.

90.     Not only did the BOP lie to Ms. Bronfman regarding her transfer to the Danbury Camp, but, upon information and belief, they also violated the spirit of the joint stipulation by placing an unjustified new black mark on her file: a Management Variable of "Greater Security."

91.     According to the Program Statement, this Management Variable ("MGTV") should be applied only in certain limited circumstances such as pending charges, detainer, or escape risk—none of which apply to Ms. Bronfman.

92.     Rather than document any such circumstances, the BOP instead attempted to justify the application of the MGTV by claiming that Ms. Bronfman belongs to a Security Threat Group ("STG")—a label typically employed against prison gangs.

93.     The application of the MGTV was no mistake—the Program Statement clearly states that the agency's Designation and Sentence Computation Center ("DSCC") "is the only office authorized to enter a variable." To obtain the MGTV, the BOP had to apply to the DSCC,

which is located in Grand Prairie, Texas, for review and approval. That they took such coordinated and dramatic steps to retaliate against Ms. Bronfman while simultaneously telling her that she was being transferred to the Danbury Camp illustrates the depth of the BOP's deceptions.

94.   Upon information and belief, this Management Variable was used as a pretext by the BOP to transfer Ms. Bronfman to FDC-Philadelphia and is also currently preventing Ms. Bronfman from being placed in a minimum security facility like Danbury Camp.

95.   Given the obviously retaliatory nature of these and other actions, counsel filed a motion in this Court asking that the original habeas proceedings be reopened. The BOP objected, and Ms. Bronfman's counsel filed a response.

96.   Rather than waiting for the Court to issue its ruling, BOP instead approved Ms. Bronfman's transfer to FDC-Philadelphia and moved her there on March 29, 2023, where she had been housed for 16 months before arriving in Danbury and where she remains today.

97.   The conditions of Ms. Bronfman's confinement in FDC-Philadelphia are inhumane and hazardous to her health. Just last week, Ms. Bronfman's cell was flooded with sewage, including human feces. Ms. Bronfman and the other women in her unit were awake until 2:00 am one night attempting to clean up, but BOP personnel refused to provide bleach or other proper cleaning equipment, and left a large container of sewage and human feces sitting in the cell block.

## COUNT I
### *Accardi* Violation

98.   Petitioner repeats and re-alleges Paragraphs 1 through 96 as if set forth fully herein.

99.   Petitions for writs of habeas corpus that, like Ms. Bronfman's, challenge "the *execution* of a federal prisoner's sentence, including such matters as the … type of detention and prison conditions," are appropriate pursuant to 28 U.S.C. § 2241(a). *E.g.*, *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (emphasis in original).

100.    Under the principles set forth by the United States Supreme Court in *Accardi v. Shaughnessy,* 347 U.S. 260 (1954), the BOP must follow its own regulations.

101.    The BOP's failure to follow its own regulations constitutes a violation of Ms. Bronfman's Due Process rights. *Accardi*, 347 U.S. at 266-67; *see also Stafford*, 2001 WL 548898 at *1 ("[T]he BOP is bound to apply [its] regulations, and its failure to do so can create a due process violation where, as here, prejudice to the Petitioner results.").

102.    None of the applicable circumstances, including pending charges, detainer, or escape risk, support the application of a management variable of "Greater Security" under the Program Statement.

103.    BOP's decision to apply the MGTV to Ms. Bronfman violates the *Accardi* principle because the BOP did not follow even its own rudimentary regulations and instead applied the MGTV in an arbitrary and capricious manner in abuse of its discretion to assign management variables to incarcerated individuals like Ms. Bronfman.

104.    Additionally, BOP's failure to follow its own policies, resulting in the arbitrary and capricious application of the MGTV to Ms. Bronfman, has unconstitutionally prejudiced her.

105.    Because of the MGTV, Ms. Bronfman is not eligible for designation to a minimum-security facility. Among other things, minimum security facilities "are work- and program-oriented;" low security facilities, such as the one in which Ms. Bronfman is currently housed, are not.

106.    This prejudice, arising as a result of BOP's failure to follow its own policies, gives rise to a violation of Ms. Bronfman's Due Process rights to equal protection under the law pursuant to the Fifth Amendment to the U.S. Constitution. *Stafford*, 2001 WL 548898 at *1.

107.    In light of the foregoing, Ms. Bronfman is entitled to a writ of habeas corpus directing Respondents to remove the MGTV as applied to her.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner-Plaintiff Clare Bronfman respectfully requests the following relief:

(1)    Pursuant to 28 U.S.C. § 2243, the issuance of a writ of habeas corpus directing Respondents to remove the Management Variable of Greater Security applied to Petitioner;

(2)    Pursuant to 28 U.S.C. § 2243, the issuance of a writ of habeas corpus directing Respondents to transfer Ms. Bronfman to the minimum security facility at Danbury Camp;

(3)    An order requiring Respondent/BOP Director Colette Peters to testify before this Court regarding the circumstances of the application of the Management Variable to Ms. Bronfman's file and of Ms. Bronfman's transfer to FDC-Philadelphia;

(4)    An order holding Respondents in contempt for violating the Joint Stipulation by placing a Management Variable on her file;

(5)    An order holding that Respondents acted arbitrarily and capriciously by placing a Management Variable on her file;

(6)    In the interest of party and judicial economy, that this petition be assigned to the Honorable Jeffrey Alker Meyer, who presided over the original habeas proceedings; and

(7)     All additional and further relief that this Court may deem just and proper.

Dated: May 10, 2023                         Respectfully submitted,

**LAW OFFICE OF MICHAEL L.
CHAMBERS, JR.**


By:__/s /_____
    Michael L. Chambers (CT Bar No. 423287)

    Law Office of Michael L Chambers Jr.
    2 Congress St
    Hartford, 06114
    michael@mchamberslaw.com

**RONALD SULLIVAN LAW, PLLC**

    Ronald S. Sullivan Jr.
    (*pro hac vice to be filed*)
    1300 I Street, N.W., Suite 400 E
    Washington, D.C. 20005
    Tel. (202) 313-8313
    rsullivan@ronaldsullivanlaw.com


**LEVIN & ASSOCIATES, PLLC**

    Duncan Levin
    (*pro hac vice to be filed*)
    44 Court Street, Suite 905
    Brooklyn, New York 11201
    Tel.: (212) 330-7626
    dlevin@levinpllc.com

    *Counsel for Petitioner-Plaintiff Clare
    Bronfman*