**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CLARE BRONFMAN,<br>        *Petitioner-Plaintiff,*<br>v.<br><br>TIMETHEA PULLEN, et al.,<br>        *Respondents-Defendants*. | Case No. 3:23-cv-619 (JAM)<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY TO RESPONDENTS' RESPONSE TO SHOW CAUSE ORDER AND**
**MOTION TO DISMISS**

**INTRODUCTION**

Respondents state at the outset of their Response to Show Cause Order and Motion to Dismiss that the habeas petition challenges the "execution of Petitioner's sentence—namely, how [the Bureau of Prisons ("BOP")] determined Petitioner's 'management variable,' [("MV")] and the location where she is incarcerated." (ECF Dkt No. 15 at 1).

That articulation of the issues presented here is so devoid of context, so arid in its legal formalism, that it can only be said to wholly mislead the reader. The petition is about the management variable and location of Ms. Bronfman's incarceration only insofar as both are symptoms of the way in which Respondents have systematically and persistently deprived Ms. Bronfman of her rights by falsely labeling her as a sex offender and then retaliating against her once it became clear that this Court was not inclined to let them do so. *See* Exhibit A, Timeline of Retaliation. By pretending that the new "MV" is anything other than the same old PSF by another name, BOP attempts to mislead this Court, avoid its jurisdiction, and continue a frankly shocking campaign against Ms. Bronfman. They must not be allowed to do so, lest the Bureau of Prisons be free to evade any and all judicial supervision of its treatment of incarcerated persons simply by

applying a random new label, with absolutely no cause, and moving the targets of its abuse around the country.

## ARGUMENT

### I.  This Court retains jurisdiction over the habeas proceedings.

Anyone reading Respondents' Motion to Dismiss would assume that this Court has not already heard these arguments before. But the term "management variable" has the exact same effect on Ms. Bronfman as did the Public Safety Factor discussed in *Bronfman I*—it obligates BOP's functionaries to keep her in a facility with a higher security designation than the one where her BOP security scores require and where the sentencing judge intended her to serve her time. Though this is the effect it has on BOP procedure, it also has a strong effect on Ms. Bronfman herself, marking her as a sex offender. The petition Ms. Bronfman brings in these proceedings pertains to the very same set of facts as the original habeas proceeding—except now BOP has metaphorically performed a quick "find all and replace" on its records so that what once said "PSF" now says "MV". This point cannot be understated. From the date of the filing of the joint stipulation to the sudden appearance of the Management Variable, nothing happened – absolutely nothing. Ms. Bronfman engaged in no conduct whatsoever to warrant any change of status, and the government cannot cite to anything. Literally, someone, somewhere randomly placed a an MV in her file – one that the Danbury Warden did not even sign. It is a truly remarkable state of affairs.

The implications of the government's position are far-reaching. If the government's position is correct, it could defeat – always – a habeas petition by moving the petitioner out of district. Note that in this case *there was pending litigation*. A Motion to Reopen was pending before this Court. *Bronfman v. Pullen*, No. 3:22-cv-838, ECF No. 42.  The government responded to this motion. *Id*, ECF No. 44.  While this court had these motions under advisement, the government

secreted Ms. Bronfman off at 4:50am, a time when no telephones were available, and the computers were off – a time where she could not contact her counsel to seek an emergency order to stay the move while a habeas petition was pending.

It is noteworthy that BOP did not permit Ms. Bronfman to "pack-out" and prepare her belongings before a move, as BOP has done each and every time that she has moved before. It is clear that BOP spirited her out of Danbury under the cover of night to avoid any process that could have slowed its jurisdictional gambit. And in fact, they had *told* her that she would be moved not to Philadelphia, but to the camp where she should have been housed in the first place. When Ms. Bronfman was awakened at 4:50 in the morning she learned not only that she was being moved but that she had been cruelly lied to: at the direction of BOP employees, she had put in transfer papers to the camp and was withdrawing her applications to the FIT program.

The government has the audacity to suggest in its pleading that Ms. Bronfman was not "forced to withdraw" from the FIT program, Opposition at 23, when, in reality, Ms. Bronfman was fraudulently induced to withdraw under a promise to move to the camp. Fortunately, Ms. Bronfman retained one of her emails to the psychiatrist/psychologist who administers the program, Dr. Stacey. As the court can appreciate, Ms. Bronfman's contemporaneous writing corroborates that once the PSF was removed, Ms. Bronfman was quite willing to take the FIT program. *See* Exhibit B. Ms. Bronfman writes, "I would have found the program, with the aim if [sic] self betterment [sic] and earning a mentor role, very meaningful." *Id*. Ms. Bronfman was told this is what she had to do to move to camp now that the PSF was removed.  All the while BOP was inducing her to do this to facilitate an improper move to another prison.

If this duplicitous activity properly defeats jurisdiction, it will send a loud and clear message to BOP that it can move an inmate while litigation is pending and thereby defeat

jurisdiction.  Pushed to its logical conclusion, BOP can forever and for all times continue to move an inmate, defeat jurisdiction, and force an inmate to re-file in a new jurisdiction. This gambit could continue until the expiration of an inmate's sentence: the harsh result being that the inmate effectively receives no recourse at all. That is what will happen here if Ms. Bronfman is forced to begin the administrative appeals process again. Respectfully, in a country of laws, this cannot be.

### A.  These proceedings continue the original habeas arguments.

Admittedly, there are some new facts: since signing the joint stipulation after oral argument in *Bronfman I*, BOP has actually subjected Ms. Bronfman to even *worse* treatment than that complained of in the prior proceedings.  But the essential facts are exactly the same, as a result of which these proceedings are really only a continuation *Bronfman I*, which was filed and even argued while Ms. Bronfman was in Danbury.  Accordingly, this Court retains jurisdiction.

### B.  The named Defendants are the proper habeas respondents.

For the same reason, the named Respondents are in fact the correct parties. It was presumably they who initiated the paperwork giving Ms. Bronfman the defamatory PSF and then converted it to a management variable. If not, they would not have had the authority to sign the joint stipulation, which purported to solve the *exact* same problems complained of here, the *exact* same problems that the joint stipulation was designed to prevent.

Respondents' attempt to escape jurisdiction—while disclaiming their ability to respond to the merits of the petition—comes in the midst of a misguided analysis of two generalized rules that do not apply to the particular nature of this case. The "immediate physical custodian rule" is inapplicable here. Respondents argue that "[c]hallenges to a 'Management Variable' and the prisoner's place of incarceration—such as the Petitioner raises here—are challenges to present

physical custody, subject to the immediate physical custodian rule." ECF Dkt. No. 15 at 11 (citing

*Saleh v. Young*, No. 5:19-cv-468 (FMV), 2021 WL 1758711, at \*2 (S.D.W. Va. May 4, 2021).

That is not how the "immediate physical custodian rule" has been defined in this district.
As the court explained in *Dailey*, which respondents quote at length, "[u]nder . . . the 'immediate
physical custodian rule,' a habeas petitioner challenging her 'present physical confinement'
generally should file her section 2241 habeas petition against the 'person' with the ability to
produce the prisoner's body before the habeas court', the warden of the facility in which she is
being held. Challenges to sentence calculation and disciplinary loss of time credit are challenges
to present physical custody subject to the immediate physical custodian rule." *Daily*, at \*2.

But here Ms. Bronfman is *not* contesting her present physical confinement or her sentence
calculation. Rather, she is contesting, as she has been *for more than a year,* BOP's stigma-plus
style defamation, which began as a PSF and now has been converted into a "management
variable": a piece of BOP jargon so mysterious that even Respondents admit that they can only
find it in "exceedingly few federal court opinions . . ." (ECF Dkt. No. 15 at 3 n.3). Why so
mysterious? Because it is nothing more than a PSF by another name. Based on their overly broad
reading of the rule, Respondents argue that the petition "must be directed to Andy Cruz, the Warden
of the facility in which [Ms. Bronfman] is presently confined." *Id*. at 10. And what if the petition
were so addressed? Perhaps she would win that petition. And go back to Danbury where the
Management Variable can be slapped back on her record?

The "territorial jurisdiction rule" is similarly inapplicable. Again, Respondents cite *Dailey*
for the definition of the rule: "the court issuing the writ [must] have jurisdiction over the custodian
. . . This is because a writ of habeas corpus operates upon the prisoner's custodian, not on the
prisoner." *Dailey*, at \*3. As argued above, the relief requested is not of anyone in Philadelphia. The

"custodian" in any relevant sense is the *same* person who had the ability to agree to the joint stipulation in *Bronfman I* and who violated its terms.

## C. The government's transparent attempt to evade jurisdiction violates its own rules.

There is no basis in fact or law for the sudden addition of a Management Variable. Ms. Bronfman has been in custody since September 30, 2020. Until the instant episode, she has never had a MV in her file. The reason is simple: she doesn't qualify for one. So, what happened in the weeks after the government signed the joint stipulation to justify a Management Variable? A Management Variable applies when an incarcerated person is placed in a facility that is not consistent with their scored security level. *See* U.S. Dept. of Justice, Fed. Bureau of Prisons, Program Statement No. P5100.08, Inmate Security Designation and Custody Classification, Ch. 5. Management Variables can sometimes be applied to house an inmate in a lower security setting. For example, a MV that BOP *could* have applied would be MV code "B"—for situations such as this one where the "sentencing court . . . recommend[s] a specific institution or program." *Id*. Rather than that sensible choice, BOP has used the MV to *raise* the security level of Ms. Bronfman's housing: a situation that applies when there are reasons to separate inmates from the general population, when the inmate has medical or psychiatric "problems," or where the inmate is deemed to require "Greater Security" as we understand to be the case here. The Program Statement explains the Greater Security designation to be appropriate when there are "security concerns which are not adequately reflected in the classification scheme. In circumstances where an inmate represents a greater security risk (i.e., pending charges, detainer, escape risk, etc.) than their assigned security level, they may be placed outside normal guidelines . . . " *Id*. None of this applies to Ms. Bronfman: she had no pending charges, no detainer, and there is no evidence she is an escape risk. And nothing has changed about her situation: she did not suddenly join a gang, get

into a fight, or become a terrorist. To the contrary, her prison record is delightfully bland as regards

security concerns. She works, takes classes, and is a model inmate. There is nothing – nothing –

in her record that indicates otherwise. The application of the MV is quintessentially arbitrary; it is

the very definition of arbitrary.

In truth, and on information and belief, BOP slapped this MV on Ms. Bronfman because

her security level was so low that she could not be moved to Philadelphia per BOP's own rules.

*See* Exhibit C.  Ms. Bronfman's security level is a negative seven (-7).[1] The only way to move an

inmate with a -7 score to FDC Philadelphia is if she has a MV.  BOP, therefore, put a MV in her

file without cause or justification, and only in retaliation for the removal of her PSF so that the

status quo would remain, notwithstanding that BOP had just executed an agreement with Ms.

Bronfman. Unfortunately, Ms. Bronfman was the sole party entering this agreement in good faith.

**II.      Defendants cannot hide behind the administrative remedy requirement.**

"Exhausted" is indeed the correct word. We will spare the Court from a lengthy recitation

of the even more lengthy appeals process that Ms. Bronfman has already gone through. But let's

be clear: *she has been fighting this for more than a year*. She completed every step in the

administrative remedy machine from the futile request for informal resolution through the futile

appeal of the BP-9 denial. It took more than ten months. And *finally,* Ms. Bronfman got her day in

court, after which Respondents signed a stipulation and represented to undersigned counsel that

they would cease their persecutions of her. Though they incorrectly argue that Ms. Bronfman has

not exhausted her administrative remedies, Respondents nonetheless articulate situations in which

the Court may excuse prudential exhaustion requirements: when "(1) available remedies provide

---

[1] This security level is so low that in normal circumstances it would qualify Ms. Bronfman for a "gate pass" that would allow her to work outside of the facility. In fact, she was encouraged to take a class certifying her to drive a forklift, and did so for this purpose. But as even further evidence of BOP's chicanery, she is not permitted a gate pass because of the arbitrary MV.

no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate

judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has

raised a substantial constitutional question." (Dkt. No. 15 at 16 (citing *Emery v. Pullen*, No. 3:22-

cv-1003 (SVN), 2023 WL 348114, at *4 (D. Conn. Jan. 20, 2023))).

Incorrectly, Respondents claim that none of those factors are present here.  But it is

pellucidly clear, based on the instant facts, that "available remedies provide no genuine opportunity

for adequate relief." Was it Einstein who said that the definition of insanity is to repeat the same

action over and over again and to expect different results? If Ms. Bronfman goes through the

process—again—she will absolutely get the same results: a refusal by BOP to explain any sensible

reason why a "management variable" is required or reasonable. Without immediate judicial relief

Ms. Bronfman will continue to suffer the exact same injuries that she presented to this very Court

in *Bronfman I*, the very same injuries that she suffers today. Further appeal to the BOP machinery

is clearly futile.

Respondents further argue that "[a] habeas petition that raises a new legal basis for the

relief sought, which was not addressed through a prisoner's BP-8 or BP-9, is not exhausted." (ECF

Dkt. No. 15 at 15 (citing *Donato*, 2023 WL 1967340, at *3)). In citing *Donato*, Respondents

describe that case as standing for the proposition that a habeas petition should be rejected for failure

to exhaust administrative remedies when "based on novel legal theory . . ." and characterize the

prior request as being "based on a different legal theory." *Id*. But no claims here are novel in the

least. They are the *exact same claims* as *Bronfman I*.

III.    **The petition correctly states a habeas claim.**

        A.  **Ms. Bronfman has a liberty interest in not being defamed by the government.**

Respondents argue—just as they did months ago—that Ms. Bronfman has no liberty interest involved in this case and therefore the Court can grant no relief. To read the Motion to Dismiss with any credulity would require the reader to imagine that Respondent-Defendants have simply forgotten the arguments they made in the previous proceeding. Respondents refuse to acknowledge that the exact same arguments presented in *Bronfman I* are presented here. Rather, they consistently confuse the right that is being violated with the remedy being requested.  Ms. Bronfman does not argue that she has a specific liberty interest in a specific management variable determination or to be housed in a specific BOP facility. She does argue, however, that she has a right—fully briefed in *Bronfman I*—to be free from the kind of government defamation that gives rise to a stigma-plus claim. Quite unfortunately, it is clear that an order from this Court to BOP that they cease and desist from that defamation will not provide adequate relief. That much is clear because BOP, assuming that such a ruling was coming, called undersigned counsel after oral argument in *Bronfman I* with an ersatz settlement offer. Rather than following the spirit of the resulting stipulation, which would have had the same effect as an order to cease defaming her, Respondents chose to retaliate against Ms. Bronfman.

### B.  The petition correctly states a claim under the *Accardi* doctrine.

Respondents argue that the "Accardi claim fails because [Ms. Bronfman] has not identified any rights to which she is guaranteed." (ECF Dkt. No. 15 at 21). This is false. Ms. Bronfman is guaranteed the right to be free of government-sponsored defamation that rises to the level of a stigma-plus claim.

### IV.    The Court can and should provide the other requested relief.

Respondents argue that "the concerns that animated the habeas petition and the Court in *Bronfman I* are not present here" (ECF Dkt. 15 at 9). That is an absurd assertion. Only by providing the relief requested can this court stop BOP's pattern of harassment and legal gamesmanship.

**CONCLUSION**

*Just today* a prison official confirmed to undersigned counsel that Ms. Bronfman *had actually been designated* to the camp where she should have been housed all along . . . until BOP slapped the retaliatory MV on her record. Through a pattern of retaliatory attacks in the form of transfers and paperwork, BOP has made it painfully clear that it has no intention of honoring the express intentions of the sentencing judge in Ms. Bronfman's case, the agreement made between BOP and undersigned counsel, or indeed Ms. Bronfman's constitutional rights. We respectfully request that the Court grant the requested relief rather than allow BOP to continue waging its indefensible war of attrition against her.

Respectfully submitted,

**LAW OFFICE OF MICHAEL L. CHAMBERS, JR.**

By: /s/_____
Michael L. Chambers

Law Office of Michael L Chambers Jr.
2 Congress St
Hartford, 06114
michael@mchamberslaw.com

**RONALD SULLIVAN LAW, PLLC**

Ronald S. Sullivan Jr.
(admitted *pro hac vice*)
1300 I Street, N.W., Suite 400 E
Washington, D.C. 20005